**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

**UNITED STATES OF AMERICA**

                                      **23 CR 610 (PKC)**

     -v.-

**WILSON DACOSTA,**

        **Defendant.**

-------------------------------------------------------------X

# DEFENDANT WILSON DACOSTA'S
# MOTIONS *IN LIMINE*

**Sercarz & Riopelle, LLP**
**950 Third Avenue, 31st Floor**
**New York, New York 10022**
**(212) 586-4900**
**Fax: (212) 586-1234**

**Xavier Donaldson, Esq.**
**800 Third Avenue**
**New York, NY  10022**
**(646) 492-5600**

*Attorneys for Defendant Wilson DaCosta*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

POINT I

THE COURT SHOULD DISMISS THE WIRE FRAUD CHARGES AS TIME BARRED OR
DUPLICITOUS, OR, IN THE ALTERNATIVE, THE COURT SHOULD INSTRUCT THE
JURY ON THE APPLICATION OF THE STATUTE OF LIMITATIONS TO THE CHARGES
IN THIS CASE ........................................................................................................................ 3

POINT II

THE COURT SHOULD PERMIT THE DEFENDANT TO OFFER EVIDENCE THAT
▮▮▮▮▮▮▮▮▮▮▮▮ HIRED A CONTRACTOR TO GAIN UNLAWFUL ENTRY INTO
DACOSTA'S EMAIL ACCOUNT AT GE, AS WELL AS OTHER EVIDENCE OF
▮▮▮▮▮▮▮▮'S BIAS AGAINST THE DEFENDANT AND UNLAWFUL CONDUCT .............. 5

   A.   ▮▮▮▮▮'s Statement To The Agent Is Admissible ............................................. 6

   B.   In Addition, Emails And Text Messages By ▮▮▮▮▮ Are Admissible Pursuant To Various
      Exceptions To The Hearsay Rules ......................................................................... 7

POINT III

THE COURT SHOULD NOT ADMIT EVIDENCE OBTAINED FROM THOSE DEVICES
ACCESSED BY ▮▮▮▮▮▮▮'S CONTRACTOR WITHOUT REQUIRING THE
GOVERNMENT TO PRESENT PROOF THAT THE DOCUMENTS ARE AUTHENTIC  AND
THAT THEY WERE NOT THE SUBJECT OF ALTERATION ...................................................... 7

POINT IV

THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE ALL RECORDS OF
STATEMENTS MADE TO LAW ENFORCEMENT AGENTS BY ▮▮▮▮▮▮▮ AND ▮▮▮▮▮▮
▮▮▮▮▮ AS BRADY MATERIAL, AND IMPEACHMENT MATERIAL ADMISSIBLE
PURSUANT TO FED. R. EVID. 806 ........................................................................................... 9

POINT V

THE COURT SHOULD NOT PERMIT THE GOVERNMENT TO OFFER IMPROPER LAY
OPINIONS  NTERPRETING THE EVIDENCE IT OFFERS ..................................................... 10

POINT VI

THE COURT SHOULD PRECLUDE EVIDENCE OF INVOICES RENDERED BY DACOSTA
TO ▮▮▮▮▮▮, AND PAYMENTS MADE BY ▮▮▮▮▮▮ TO DACOSTA ......................... 11

POINT VII

THE COURT SHOULD ALSO PRECLUDE PROOF OF THE UNCHARGED CONSPIRACY
TO DEPRIVE GE OF DEFENDANT'S HONEST SERVICES .................................................. 15

POINT VIII

THE COURT SHOULD PRECLUDE PROOF OF ALLEGED AND UNCHARGED
FORGERIES PURPORTEDLY CREATED BY DACOSTA ........................................................ 17

POINT IX

THE COURT SHOULD ALLOW DEFENDANT TO OFFER PROOF THAT THE
GOVERNMENT OF ANGOLA INTENDED TO PURCHASE AT LEAST TWELVE
TURBINES BOTH BEFORE AND AFTER THE EVENTS DESCRIBED IN THE
INDICTMENT .................................................................................................................... 18

POINT X

DEFENDANT RESERVES HIS RIGHT TO MAKE ADDITIONAL MOTIONS *IN LIMINE*
WHEN THE GOVERNMENT'S EXHIBITS ARE MARKED, AND JENCKS ACT
MATERIALS ARE PRODUCED ............................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001).................................................................... 10

United States v. Aiello, 864 AtF.2d 257 (2d Cir. 1988) ........................................................11

United States v. Aracri, 968 F.2d 1512 (2d Cir. 1992) ......................................................... 4

United States v. Dicker, 853 F.2d 1103  (3d Cir. 1988) ........................................................11

United States v. Rivera-Ventura, 72 F.3d 277 (2d Cir 1995) ............................................... 4

United States v. Salazar, 112 F.3d 506 (2d Cir. 1997) ........................................................11

**Rules**

Fed. R. Evid. 806 .................................................................................................................. 7

Fed.R.Evid. 404(b).............................................................................................................. 17

**DEFENDANT WILSON DACOSTA'S**
**LIMINE MOTIONS**

**PRELIMINARY STATEMENT**

Defendant Wilson DaCosta ("Defendant" or "DaCosta") submits this Memorandum of Law in support of his motions *in limine*, and in response to the government's motions *in limine*.

In its Memorandum of Law in support of its motions *in limine*, the government includes a lengthy description of the facts it expects to prove at trial. Some of these facts will be conceded and stipulated by the Defendant. Others will be contested, as indicated below. And the Defendant expects to prove many facts in his own defense, through cross-examination, and, if necessary, calling his own witnesses. For the purposes of this Memorandum, the Defendant need not list every fact he will contest at trial, nor will the Defendant present his own lengthy version of the factual history relating to the government's superseding indictment. As the Court will instruct the jury, the Defendant bears no burden to prove anything when defending this case, and, for now at least, the Defendant stands on that right.

The government's Memorandum of Law also includes a lengthy disquisition on some of the Rules of Evidence that will apply in the trial of this matter. The government's description of the law is accurate, but because we do not have a government exhibit list and marked exhibits, the defense cannot be sure that it will not object to some of the documentary evidence the government will offer. We can reassure the Court that the defense does not intend to challenge the authenticity of many government exhibits; indeed, we have agreed to stipulate to the authenticity of much of the evidence the government intends to offer. But the Defense must reserve its right to object to exhibits on substantive grounds – such as relevance or hearsay –

until such time as we see the exhibits and they are presented at trial, and a foundation for their admission is established by testimony.

These motions *in limine* address a series of issues relating to the superseding indictment and proof that the government will likely offer. The Defense also moves *in limine* for rulings on certain evidence it believes it should be allowed to offer to support the Defendant's theory of defense, and for the production of witness statements the Defense believes in good faith will include Brady material. The Defense makes these motions to establish the admissibility of proof it may choose to include in its opening statement; to highlight legal infirmities in the superseding indictment itself and to preclude the government from offering testimony that would be improper – such as soliciting a lay opinion as to the meaning of emails in which the witness did not participate.

For all the reasons stated below, the Defendant respectfully requests that the Court grant his motions *in limine* in all respects.

## POINT I

## THE COURT SHOULD DISMISS THE
## WIRE FRAUD CHARGES
## AS TIME BARRED OR DUPLICITOUS,
## OR, IN THE ALTERNATIVE,
## THE COURT SHOULD INSTRUCT THE JURY
## ON THE APPLICATION OF THE
## STATUTE OF LIMITATIONS TO THE
## CHARGES IN THIS CASE

Count One of the superseding indictment in this case charges that the wire fraud occurred from August 2017 to "in or about 2019."[1]  To stretch its wire fraud charge over a two-year period, the government's motions *in limine* direct the Court to a series of additional forgeries which the Defendant allegedly committed after the forgeries alleged in this case.  Pointing to these additional acts, and emails sent by and to the Defendant long after the scheme charged in Count One was complete, the government suggests that these additional alleged forgeries and wires are part of the fraud charged in Count One of the superseding indictment, which would bring the charge within the applicable, five year statute of limitations.  See e.g., Government Brief, Dkt. No. 43, p. 29.  The government made similar arguments in connection with the Defendant's motion to dismiss the wire fraud count in the original indictment on statute of limitations grounds.  See Dkt. No. 24, pp. 13-17.  If the Court takes the government at its word, then Count One of the superseding indictment is duplicitous, because it charges multiple acts of wire fraud in a single count.  Alternatively, if the government's charge in Count One is based on the forged documents described in that count, it is time-barred, because the wire fraud at issue in

---

[1]  Counts Two and Three (Aggravated Identity Theft) also charge that the crimes charged in those counts were committed from August 2017 to in or about 2019.  These alleged identity thefts occurred when the alleged forgeries were completed and transmitted to GE on October 12, 2017, or, at the latest, when GE wired funds to GE Packaged Power and AEnergy in December 2017.  And these counts are entirely derivative of the crime charged in Count One, because they can only exist "during and in relation to a[nother] felony violation."  So, if the Court finds the wire fraud charged in Count One must be dismissed as time-barred or for any other reason, it must dismiss Counts Two and Three as well.

this case was complete no later than December 2017, more than five years before the government first charged the Defendant with the commission of wire fraud in October 2023.

A crime is complete when all elements of the crime have been satisfied. United States v. Rivera-Ventura, 72 F.3d 277, 281 (2d Cir 1995). The wire fraud charged in Count One of the superseding indictment – the use of forged letters purporting to be issued by the Angolan Government to persuade GE Capital to wire funds to pay for the turbines and services in Angola – was complete when GE Capital wired $641 million to GE Packaged Power and AEnergy in December 2017. Subsequent wires and alleged misrepresentations could arguably be new wire frauds, but they are not part of the crime of wire fraud actually charged in Count One of the superseding indictment. The Court should therefore dismiss Count One of the superseding indictment as time-barred, because the statute of limitations applicable to Count One began to run when the funds obtained by the alleged fraud were wired to AEnergy and GE Packaged Power in December 2017.[2]

In the alternative, the Court should dismiss the wire fraud charges in Count One of the superseding indictment as duplicitous, because Count One lumps together a series of allegations concerning distinct alleged wire frauds in a single count. See United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) ("an indictment is duplicitous if it joins two or more distinct crimes in a single count"). In this case, the government's insistence that multiple completed wire frauds should be lumped together in a single count of wire fraud is fatal to the government's case. See, e.g., Government's Brief in Support of its Motions In Limine, Dkt. No. 43, p. 29 (arguing that "Additional Forgeries" should be admitted as inextricably intertwined with the forgeries charged

---

[2]  If the Court denies this motion to dismiss the superseding indictment, the defendant respectfully requests that the Court instruct the jury on the issue of the application of the statute of limitations in this case. See Defendant's Proposed Jury Charges, submitted simultaneously with this Memorandum of Law.

in Count One). The fact of the matter is that the fraud charged in Count One was complete when the funds were wired to GE Packaged Power and AEnergy in December 2017. If additional forgeries were created and wires were transmitted after that date, those were additional crimes and are duplicitous if included in Count One of the superseding indictment.

**POINT II**

**THE COURT SHOULD PERMIT THE DEFENDANT
TO OFFER EVIDENCE THAT █████████
HIRED A CONTRACTOR TO GAIN UNLAWFUL ENTRY
INTO DACOSTA'S EMAIL ACCOUNT AT GE, AS
WELL AS OTHER EVIDENCE OF MACHADO'S BIAS
<u>AGAINST THE DEFENDANT AND UNLAWFUL CONDUCT</u>**

When interviewed by a Special Agent, █████████████████ stated that, after his relationship with GE and DaCosta ended, he hired an independent contractor unlawfully to access the electronic devices and email accounts of DaCosta and others, and to provide the agents with documents that, in ████████ view, pointed to suspicious activity by DaCosta and others. That is, █████████ confessed openly to an agent of law enforcement that he was guilty of aggravated identity theft, by stealing other persons' passwords and surreptitiously tampering with their email accounts.[3]

The government has indicated that while it does not intend to call ████████ as a witness at trial, it will seek to offer emails and text messages by ████████ pursuant to various exceptions to the hearsay rules. (See Gov't *In Limine* Motion at p. 17 et seq. with regard to the "friends group chat" which included ████████; <u>see also id</u>. at pp. 24-30 regarding discussion of evidence of DaCosta's receipt of $5 million from AE's founder in December 2017 and demands for

---

[3]  The excerpt from the agent's report of interview in which Machado makes this admission is attached as Exhibit A.

additional illicit payments between 2016 and 2018 either as direct evidence or pursuant to Fed.R.Evid. 404(b)).

**A.**    ██████'s Statement To The Agent Is Admissible

The statement is highly relevant to several issues.  First, the statement tends to prove that ██████ tampered with DaCosta's email account at GE, and therefore that the emails present in that account are not authentic and should be rejected as evidence by the jury at trial.  Second, the statement tends to undermine the credibility of ██████ who will be an offstage hearsay declarant heavily relied upon by the government.

Because ██████'s statement to the agent tends to incriminate him, it is admissible pursuant to Fed. R. Evid. 804(b)(3)(A) and (B), as a statement "(A) …so contrary to the declarant's proprietary or pecuniary interest, or [that] had so great a tendency to … expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

The government concedes ██████ is a criminal, and a member of the alleged (but uncharged) conspiracy to defraud GE and Angola.  The statement offered is consistent with ██████'s criminality as alleged by the government, and because it was made to a law enforcement officer, it can be readily and convincingly proven, by calling the Law Enforcement Agent who heard and wrote down the statement to testify to it.  So there are ample corroborating circumstances to corroborate the trustworthiness of the statement offered.

**B. In Addition, Emails And Text Messages By ████████ Are Admissible Pursuant To Various Exceptions To The Hearsay Rules[4]**

████████s hearsay statements will consist of his own emails and texts with DaCosta and others, and the government will offer and then sponsor ████████s out of court statements as key proof in the case, without calling ████████.  As a hearsay declarant upon whom the government will rely, ████████'s statements may be impeached pursuant to Fed. R. 806, just as if he were testifying in Court to the hearsay statements the government intends to offer.  <u>See</u> Fed. R. 806. The sort of criminality described by ████████ in his admission that he hacked into DaCosta's email account is key to undermining ████████'s credibility as a hearsay declarant.  So his statement admitting his criminality is plainly admissible pursuant to Fed. R. Evid. 806.

To permit, on the one hand, the introduction of a large volume of ████████s hearsay statements; while, on the other hand, precluding evidence regarding ████████'s own aggravated identity theft and his manifest hostility toward the defendant, would amount to a denial of the Defendant's right to confrontation under the Sixth Amendment.

<u>**POINT III**</u>

**THE COURT SHOULD NOT ADMIT EVIDENCE OBTAINED FROM THOSE DEVICES ACCESSED BY ████████S CONTRACTOR WITHOUT REQUIRING THE GOVERNMENT TO PRESENT PROOF THAT THE DOCUMENTS ARE AUTHENTIC  AND THAT THEY WERE <u>NOT THE SUBJECT OF ALTERATION</u>**

Reports prepared by the government in connection with its interactions with ████████ indicate that prior to obtaining documentary evidence from ████████, he was permitted to (1)

---

[4]  For the reasons outlined in Point III, *infra*, the Government should be required to offer proof of the authenticity of any emails or text messages allegedly obtained from the defendant's email account on the GE server.

examine the material unlawfully obtained by ████████'s contractor at his behest; (2) rummage

through the content of these documents; and (3) produce those documents that ████████ deemed

helpful to the government in in electronic format on a thumb drive.  The government then

obtained a search warrant for the thumb drive, to retrieve the curated documentation selected by

████████ for production to the government.

    Given ████████'s evident criminality, and his involvement in the hacking that unearthed

the documents, the Defendant submits that unless the Government can establish that the

documents appeared in identical form on GE's server prior to the contractor's access; and that the

documents were not created by an outsider, they should not be admitted.  The documents were

not obtained in an ordinary search – instead, a thumb drive was prepared by ████████ and sent to

the government to be searched.  In these circumstances, it is impossible to know how many of

the documents were fabricated or tampered with either by ████████s contractor or by ████████

himself before they were put on the thumb drive that was turned over to the government; it is,

likewise, impossible to know if there are other relevant documents that ████████ withheld,

which would provide context and explanation for the documents he did produce; and without a

custodian for the thumb drive, the documents simply cannot be authenticated as required by Fed.

R. Evid 901.

    For all these reasons, the Court should refuse to admit any documents that were produced

to it by ████████[5]

---

[5]  If the Court does allow the government to offer these documents, it should permit the Defendant a robust and searching cross of the government's witnesses on the provenance of them, and the manner in which they were obtained.

**POINT IV**

**THE COURT SHOULD ORDER
THE GOVERNMENT TO PRODUCE
ALL RECORDS OF STATEMENTS MADE
TO LAW ENFORCEMENT AGENTS
BY ████████████████
AS <u>BRADY</u> MATERIAL, AND
IMPEACHMENT MATERIAL
ADMISSIBLE PURSUANT TO FED. R. EVID. 806**

The Defendant is aware that government agents have interviewed ████████ on numerous occasions. The Defendant is also aware that ██████████████████, was detained when he traveled to the United States recently, and, upon information and belief, ████████ may also have been interviewed by the government on one or more occasions. To date, the government has produced at least some of the ████████ statements, but it has not produced any statements made by ████████ if such statements exist. The Court should direct the government to produce these statements promptly, whether or not the government will call ██████████████ as witnesses at trial, for the following reasons.

Certain statements made by ████████ tend to exculpate the Defendant – for example, ████████ stated that the payments made to MAMFE by ████████ company Pera were not bribes intended to induce the Defendant and ████████ to aid and abet ████████ in defrauding GE. A copy of excerpts from a report of ████████'s interview in which this statement was made is attached as Exhibit B. The Defendant believes, on information and belief, that similar statements must have been made by ████████ he was interviewed by the government, given the government's allegations about ████████'s alleged participation in a conspiracy to deprive GE of his honest services. <u>See</u> Government Memorandum, Dkt. No. 43, at pages 17-20 (the Defense believes ████████ is GE-Employee-1 based on the government's description).

These statements by ███████ and (very likely) ██████ directly exculpate the Defendant, because they undermine the government's commercial bribery theory with respect to these payments.  See Government's Brief in Support of its Motions In Limine, Dkt. No. 43, pp. 24-27. All such statements should therefore be produced to the Defendant promptly, so that they can be analyzed and used effectively at trial.  See Leka v. Portuondo, 257 F.3d 89 (2d Cir. 2001) (Brady material must be produced in time to be investigated and exploited by defense, and late production of Brady material requires reversal).

In addition, it appears that the government will be offering as evidence numerous emails authored by and addressed to ████████████.  The defense expects that the government will attempt to argue to the jury that these emails are admissible to support its theories of commercial bribery and wire fraud, because the emails are statements in furtherance of an uncharged conspiracy to commit those crimes.  The statement made by ████████ noted above, and the statements believed to have been made by ██████, would impeach the government's interpretation of the hearsay evidence it intends to offer.  The statements sought by the Defendant would therefore be admissible as impeachment material pursuant to Fed. R. Evid. 806.

## POINT V

### THE COURT SHOULD NOT PERMIT
### THE GOVERNMENT TO OFFER
### IMPROPER LAY OPINIONS INTERPRETING
### THE EVIDENCE IT OFFERS

It now appears that the government will be offering numerous emails sent by or received by ████████████.  If ████████████████ are not called as witnesses, the Court should not permit other witnesses to speculate as to the intentions or mental states of ████████████ ████████ when the emails were sent.  Such speculative testimony is improper lay opinion, which is precluded by Fed. R, Evid. 701.  Any witness called by the government who was a participant in

10

the communication at issue may, of course, testify to his or her own impressions and understanding of communications from others.  But such a witness should not be allowed to opine as to the mental state of any other speaker or writer.  And the witness should be permitted to interpret statements made to him or her only if the statements are cryptic or confusing and fragmented.  Moreover, a witness who was not a party to the communications offered by the government should not be permitted to opine as to their meaning, because such a witness would have no basis for expressing a lay opinion as to the meaning of conversations he or she did not participate in.  The court should vigorously police the government's examination of its witnesses to limit their testimony to only those portions of their own conversations or emails that need clarification.  <u>United States v. Aiello</u>, 864 AtF.2d 257, 265 (2d Cir. 1988); <u>United States v. Dicker</u>, 853 F.2d 1103, 1109-10 (3d Cir. 1988); <u>United States v. Salazar</u>, 112 F.3d 506 (2d Cir. 1997).

**POINT VI**

**THE COURT SHOULD PRECLUDE
EVIDENCE OF INVOICES RENDERED
BY ███████████████, AND
PAYMENTS MADE BY
████████████████**

At pages 24-26 of its Memorandum in Support of its Motions *In Limine*, the government argues that invoices rendered by MAMFE, a corporation owned by DaCosta, to Pera, a corporation owned by ███████, and a payment of $5 million made by Pera to MAMFE should be admitted in evidence as proof of Defendant's motive to commit the wire fraud and identity thefts charged in the Superseding Indictment.  The government also argues that additional demands for payment made by DaCosta to ███████ should be admitted to prove DaCosta's motive to commit the crimes charged.  The government contends that this proof should be

admitted either as direct proof or a proof of other bad acts pursuant to Federal Rule of Evidence 404(b).  The government contends that the $5 million payment and DaCosta's invoices and demands for payment are proof of a commercial bribery scheme that is probative of DaCosta's motive to commit the wire fraud scheme and identity thefts charged in the superseding indictment.  The government makes this argument even though, as noted above, █████denies that the $5 million payment from Pera to MAMFE was associated with the wire fraud scheme in any way.

In its Motion *in limine*, the government describes the alleged link between the alleged commercial bribery scheme and the wire fraud alleged in the Indictment as follows:

> The $5 million paid by AE's Founder to DaCosta during the MAMFE scheme, and the repeated requests by DaCosta for additional payments between 2016 and 2018, explain part of DaCosta's motive for committing the charged crimes, and therefore evidence of the MAMFE scheme and the demands for additional payments are "inextricably intertwined" with the charged crimes.

(Gov't Memorandum at p. 24).

Yet, in the agent's notes of ████████'s proffer statements on November 16, 2023 made at the point in the interview when ████████ is confronted with documents purportedly evidencing the commercial bribery agreement between PERA and MAMFE, ████████ denies ever having seen the contracts relating to any such payment; adding, that he "never sent anything to DaCosta."  Later, during the same proffer, ████████ shifts his position and says, according to the report:

> More or less sent $5 million to DaCosta and company, including to MAMFE.
> Was not to facilitate anything in Angola.
> Paid to Cameroon.  Did have an understanding that if he paid to MAMFE it would eventually make its way back to NELSON and DACOSTA.

(*See* Agent's notes of November 16, 2023 Proffer Session at pp. 8-9, attached as Exhibit B).

The $5 million payment referenced in the agent's notes occurred in 2016. That was one year prior to GE's efforts to resolve the issue of the "turbine gap" which prompted GE to seek letters from Angolan officials indicating an agreement to purchase a total of 12 turbines. Thus, the timing of this payment tends to suggest it had nothing to do with the later events that are the focus of the superseding indictment.

The government's attempt to offer proof of this payment, related invoices, and demands for additional payments should be precluded pursuant to Federal Rule of Evidence 403. The unfair prejudice associated with this speculative proof far outweighs the minimal probative value of it. And the government's offer of this proof invites the parties and the Court to go down a speculative rabbit hole and engage in a lengthy trial of issues relating to this proof, without any clear connection to the issues that the jury will be asked to decide. The delay, distraction and confusion the government's offer of proof would engender should be rejected by the Court.

The government purports to offer this proof to establish the Defendant's motive to get money from the scheme charged in the indictment. Government's Memorandum, pp. 24-25. Has there ever been a financial crime for which the motive is something other than to get money? If so, Defense Counsel has not encountered it.

The probative value of any proof offered by the government to support the alleged commercial bribery scheme is diminished by the fact that (1) the alleged payor denies that there was any such scheme; and (2) the payor suggests that the $5 million payment was made in connection with services performed by the defendant's company in another country and in connection for work other than the efforts to provide turbines to be financed by a GE credit facility, as described in the Indictment.

13

When weighed against this minimal probative value, the unfair prejudice of the government's offer of proof is obvious and grievous. A payment of $5 million is an eye popper for many jurors. That may be more than many jurors earn in their working lives, and the envy associated with seeing such a payment is bound to be prejudicial to the Defendant.

This is particularly so where, as here, it appears that the government will have no witness to describe this payment as a bribe. The lack of that proof appears to be no impediment to the government, which will barrel along and argue to the jury that the payment is a bribe because … well … because it must be so! This sort of speculation, combined with the obviously inflammatory number $5 million, is exactly the sort of unfair prejudice Rule 403 prohibits.

Moreover, if the government offers this proof in support of the argument it makes in its Memorandum, counsel for the Defendant will be duty bound to cross examine every conceivable witness to show that no one can link this payment to the scheme charged in the indictment, and that no witness knows of any such bribe conjured by the government, and then to call the law enforcement agent who recorded ██████ statement denying this payment was a bribe, and perhaps other witnesses to rebut the government's speculative claim. This sort of side-tracked, mini-trial of issues not directly related to the issues in this case is likely to result in exactly the kind of confusion, delay and distraction that Rule 403 prohibits.

For all these reasons, the Court should preclude the government from offering the proof described in pages 24-26 of its Memorandum as unfairly prejudicial and a confusing waste of time. Fed. R. Evid. 403.

At the very least, should the government be permitted to offer documentary evidence supporting its contention of a commercial bribery scheme, defense counsel should be provided

with the opportunity to offer the agent's notes regarding statements made by ████ during his

proffer sessions in accordance with Fed.R.Evid. 806.

By the same token, should the Government seek to admit those portions of the

defendant's post arrest statement to agents in which he acknowledges that Mamfe received

payments from Pera in connection with work performed by the defendant and ████ in

Africa, the Government should be required to admit the portion of the statement in which the

defendant denies that the payments were in exchange for services performed in connection with

either the agreements involving GE, AE and the Government of Angola which are the subject of

this indictment, or the allegedly forged letters of agreement by ministers of the Angolan

Government to purchase additional turbines.  The Rule of Completeness expressly requires this,

when it provides that "[i]f a party introduces … part of a writing or recorded statement, an

adverse party may require the introduction, at that time, of any other part – or any other writing

or recorded statement – that in fairness ought to be considered at the same time.

### POINT VII

### THE COURT SHOULD ALSO PRECLUDE<br>PROOF OF THE UNCHARGED<br>CONSPIRACY TO DEPRIVE GE OF<br>DEFENDANT'S HONEST SERVICES

At pages 38-41 of its Memorandum of Law, the government moves in limine for the

admission of a host of statements, emails and other documentation relating to an alleged

uncharged conspiracy to deprive GE of the Defendant's and other GE employees' honest

services.  Apparently, the alleged conspirators include ████ the Defendant, ████ and at

least one other GE Employee, and the proof of the alleged uncharged conspiracy will consist of a

myriad of communications between the alleged co-conspirators in the form of texts and emails,

GE business records, and testimony of one or more GE employees.  The Court should preclude this proof pursuant to Federal Rule 403 as unfairly prejudicial, confusing and a waste of time.

In its Memorandum of Law, the government describes an alleged conspiracy involving the Defendant, ████ and other GE Employees to deprive GE of the conspirators' honest services in exchange for the payments to MAMFE described above.  It appears that the government will prove the alleged conspiracy by showing payments to the GE employees in exchange for their "assist[ance] in providing AE an illicit commercial advantage in its dealings with GE in Africa," by providing AE "GE's confidential business information" also described as business "intelligence."  Government Memorandum, Dkt. 43, pp. 39-40.

The Court should preclude the government from offering this evidence.  The government's only reason to offer this evidence appears to suggest that the Defendant and others were bad people engaged in a long-running conspiracy against GE.  If this evidence is permitted, the Defendant will of course be required to rebut the government's claims through the cross-exam of government witnesses about this scheme and the payments made in the course of it, distracting the jury from the proof at issue and causing an enormous waste of time dealing with issues not directly related to the charges in the superseding indictment.  This sort of mini-trial on issues not directly related to the charges in the indictment is exactly the sort of thing Rule 403 prohibits, and the Court should preclude proof and argument of the uncharged conspiracy to commit "honest services fraud" described in pages 38-41 of its Memorandum of Law.

The evidence supporting this alleged conspiracy to engage in honest services fraud suffers from the same infirmities as those described in the preceding section.  Again, in his proffer sessions with the government, ████ has denied the existence of any such conspiracy.  Again, ████ himself has posited an alternative explanation for the financial dealings

between his company and MAMFE.  Again, the introduction of evidence purported pointing to the existence of any such conspiracy will invite a distracting mini-trial regarding the existence of any such agreement and its connection to the charges contained in this Indictment.

For all of these reasons, evidence relating to the alleged conspiracy should be precluded.

## **POINT VIII**

### **THE COURT SHOULD PRECLUDE PROOF OF ALLEGED AND UNCHARGED FORGERIES PURPORTEDLY CREATED BY DACOSTA**

At pages 14-17 of its Memorandum of Law, the government describes a series of additional forgeries it asserts the Defendant created, concerning a "swap" contract, parent company guarantees, and certain invoices.  None of these forgeries appears to be directly related to the wire fraud and identity theft counts contained in the superseding indictment.  At pages 27-30 of its Memorandum, the government argues that these "additional forgeries" should be admitted pursuant to Rule 404(b) of the Federal Rules of Evidence, as evidence of the Defendant's "knowledge, intent, plan, opportunity, lack of mistake, and identity."  Government Memorandum, Dkt. No. 43, p. 27.  The Court should preclude this proof.  It too is a side-track and a distraction, and the prejudice of it far outweighs any probative value it might have.

The government apparently intends to try to prove that the Defendant is a one-man crime wave, distributing allegedly forged documents wherever he goes and whenever needed, to close every transaction he ever worked on at GE.  This is exactly the sort of thing Rule 404(b) and Rule 403 are meant to prohibit.  Rule 404(b) expressly provides that "evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Here, the government's attempt to prove a series of alleged forgeries is nothing more or less than an attempt to prove the Defendant

is a bad person who consistently forged documents all over Africa.  Therefore, the government's argument goes, he must have forged the documents at issue in this case too.  This is exactly what Rule 404(b) prohibits.

In addition, this collateral proof, like so much other collateral proof offered by the government, will result in a series of mini-trials on every alleged forged document, unnecessarily prolonging the trial of this matter, distracting the jury, and unfairly prejudicing the Defendant with each mini-trial pertaining to conduct that is not directly relevant to the charges in the superseding indictment.  This proof should be precluded pursuant to Federal Rule of Evidence 403.

## POINT IX

### THE COURT SHOULD ALLOW DEFENDANT TO OFFER PROOF THAT THE GOVERNMENT OF ANGOLA INTENDED TO PURCHASE AT LEAST TWELVE TURBINES BOTH BEFORE AND AFTER THE EVENTS DESCRIBED IN THE INDICTMENT

The discovery produced by the government to date establishes that the Government of Angola committed to purchasing additional TM 2500 turbines before the alleged forgeries were created and forwarded to GE on October 12, 2017.  The proof also establishes that the Government of Angola confirmed its intention to purchase twelve TM 2500 turbines after the alleged forgeries were created and forwarded to GE on October 12, 2017, because the Government of Angola did follow through and purchase twelve TM 2500 turbines.  This evidence establishes that the alleged misrepresentations made in the alleged forgeries were not material, because the Government of Angola always intended to purchase the twelve TM 2500 turbines that it did ultimately purchase.

Indeed, the government's own motions *in limine* acknowledge that GE and Angola always contemplated that GE would sell, and Angola would buy, 12 TM 2500 Turbines.  See Government Motion *In Limine*, p. 15 ("GE Capital had approved the Credit Facility [prior to October 2017] based on its expectation that Angola would use the Credit Facility to purchase twelve TM 2500s, which reflected the number of TM 2500s AE had contracted to purchase under the Supply Contracts at the time of GE Capital's approval").  A copy of the contract signed in August 2017, which provided for the sale of 12 TM 2500 turbines to Angola, is attached as Exhibit C.  As the government's Motions *In Limine* acknowledge, there was a "turbine gap" in lengthy, garbled paperwork relating to the deal between Angola and GE, even though all parties contemplated the sale of 12 TM 2500 turbines from the outset – and it was the confusion over the paperwork, not the underlying agreement signed in August, that resulted in the mess of facts that is this case.  See Government's Motions *In Limine*, pp. 15-16.

Moreover, since Angola did ultimately purchase and pay GE for the 12 TM 2500 turbines understood to be part of the deal in August 2017, the Defendant should be permitted to prove the fact that GE and Angola transacted for twelve turbines to argue that it was always Angola's intention to purchase at least this number of TM 2500 turbines, again demonstrating that the alleged "forgeries" were entirely consistent with Angola's intentions at the time the alleged forgeries were created.

As the government notes, during meetings in December 2018, DaCosta consistently took the position that Angola had already committed to the purchase of twelve TM 2500 turbines, and at one point even produced the documents he allegedly forged to prove that fact.  Government Memorandum, p. 12.  DaCosta should be permitted to offer proof of what happened in these meetings and his display of the alleged forgeries as proof that he believed the forgeries were

genuine, and was acting in good faith. If Dacosta were truly the forger of these documents, why on earth would he rely on them and display them to others in a meeting? The Defendant's reliance on these documents and his willingness to expose them to others is clear evidence that he believed the documents were genuine.

The fact that Angola ultimately did purchase twelve TM 2500 turbines is, likewise, proof that the alleged misrepresentations in the documents that were "forged" on October 12 were not really material. Angola, GE and AEnergy all believed and expected that Angola would buy twelve TM 2500 turbines on October 12, 2017, and Angola certainly did so, using financing provided by GE. The allegedly "forged" documents created on October 12, 2017 did nothing to change that fact, or to influence either Angola's decision to buy 12 TM 2500 turbines, or GE's decision to sell and finance those turbines. So those "forged" documents were not material, and cannot be the basis for a wire fraud charge.

## POINT X

### DEFENDANT RESERVES HIS RIGHT TO MAKE ADDITIONAL MOTIONS *IN LIMINE* WHEN THE GOVERNMENT'S EXHIBITS ARE MARKED, AND JENCKS ACT <u>MATERIALS ARE PRODUCED</u>

At this point, the government has not produced an exhibit or witness list, and no Jencks Act statements have been produced for the government's witnesses. It is possible that future productions of evidence and witness statements will prompt additional motions i*n limine* and the Defendant reserves his right to make any necessary motions when additional materials are produced. Given the acute hearsay and lay opinion issues highlighted in these motions, the Government should be required to provide the defense with a list of the emails and text messages from hearsay declarants it intends to offer, and the specific exception to the hearsay rules that

purportedly justifies the introduction of the documents. We reserve the right to oppose the introduction of emails and texts, pending receipt of the list and the government's rationale for admission of them. The Defendant also reserves his right to make any appropriate objections to the introduction of evidence at the time of trial.

Dated: New York, New York
         September 27, 2024

                                        SERCARZ & RIOPELLE, LLP

                              By:       *Roland G. Riopelle*_____
                                        Roland G. Riopelle, Esq.
                                        Maurice H. Sercarz, Esq.
                                        950 Third Avenue, 31st Floor
                                        New York, NY  10022
                                        (212) 586-4900

                                        XAVIER DONALDSON, ESQ.

                              By:       *Xavier Donaldson*
                                        800 Third Avenue
                                        New York, NY  10022
                                        (646) 492-5600
                                        xdonaldson@aol.com

                                        *Attorneys for Defendant*
                                        *Wilson DaCosta*