UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                          23-cr-610 (PKC)

              -against-                        OPINION AND ORDER

WILSON DANIEL FREITA DA COSTA,

                    Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        On November 18, 2024, a unanimous jury found defendant Wilson Daniel Freita Da Costa guilty of one count of wire fraud, 18 U.S.C. §§ 1343 and 2, and two counts of aggravated identity theft, 18 U.S.C. §§ 1028A and 2.  Da Costa moves for a judgment of acquittal and a new trial pursuant to Rules 29 and 33, Fed. R. Crim. P., urging that there was insufficient evidence to support the jury's guilty verdict on the wire fraud charge and that the Court erred by admitting Rule 404(b) evidence related to Da Costa's other acts of forgery.  (ECF 74.)  Because the government's trial evidence was sufficient to support the jury's verdict and because Da Costa has not identified extraordinary circumstances that warrant a new trial, his motion will be denied.

BACKGROUND.

        A.  Overview of the Angola Fast Power Deal.

        The charges against Da Costa relate to his participation in a scheme to forge certain letter agreements in order to facilitate a loan necessary for the sale of trailer-mounted energy turbines, known as TM 2500s, to the Republic of Angola as part of a transaction that the parties called the Angola Fast Power Deal.  At the time, Da Costa was an executive of General

Electric ("GE") based in sub-Saharan Africa.  GE Power executive Paolo Marone described Da Costa as "our commercial leader in the country [i.e., Angola]."  (Tr. 58.)

Several entities participated in the Angola Fast Power Deal.  GE Power is a division of GE that Marone called the "industrial portion of GE . . . ."  (Tr. 51.)  GE Power manufactured, sold and serviced trailer-mounted turbines.  (Tr. 51-52.)  AEnergia ("AE") was a general contractor that acted as an engineering procurement and construction company.  (Tr. 52, 349-50.)  AE was responsible for preparing the turbine sites and connecting the turbines to Angola's power grid.  (Tr. 350.)  GE Capital is a division of GE and provided financing for the Fast Power Deal.  (Tr. 53.)  From a credit facility valued at $1.1 billion, GE Capital ultimately disbursed a $643 million loan to facilitate the Angola Fast Power Deal, with $267 million going to AE and the remainder going to GE Power.  (Tr. 54, 178, 248.)

In carrying out the Angola Fast Power Deal, GE Power sold energy turbines to AE, which, in turn, sold the turbines to the Republic of Angola through the country's Ministry of Energy and Water ("MINEA").[1]  (Tr. 51-52, 67.)  Marone testified that it is customary in the power-supply industry to sell equipment to a general contractor such as AE, which then constructs the power plant for the end-user customer.  (Tr. 52.)  Accordingly, the Angola Fast Power Deal was governed by two different groups of contracts: the "supply contracts" under which GE Power sold turbines to AE, and the "on-sale contracts" under which AE sold the completed power plants to the Republic of Angola.  (Tr. 52-53.)

In 2017, the viability of the Angola Fast Power Deal was thrown into question when the Republic of Angola agreed to buy only eight turbines from AE, even though GE Power

---

[1] For consistency and ease of understanding, the Court's references to MINEA are intended to encompass two MINEA-controlled utility companies, ENDE and PRODEL.  Similarly, the Court's references to GE Capital are intended to encompass one of its subdivisions, GE Capital Energy Financial Services, also known as "EFS", and the Court's use of the term "turbines" refers to the TM 2500 turbines at issue in the Angola Fast Power Deal.

and AE had agreed that AE would buy between twelve and fourteen turbines.  (Tr. 61-62.)  This discrepancy between the number of turbines purchased by AE and the number agreed to by the Angolan government was sometimes called the "turbine gap."  (Tr. 285.)  From the perspective of GE Capital, which was financing the deal, "it was very important" that Angola buy at least twelve turbines because its loans were "predicated on selling a certain amount of equipment." (Tr. 62.)  Raghuveer Kurada, the managing director of a GE Capital subdivision, testified that the Angola Fast Power Deal had been underwritten with the expectation that the Republic of Angola would purchase at least twelve turbines, and that the risks to GE Capital increased if the transaction included fewer turbines.  (Tr. 178-79, 182.)

In his role as an executive of GE Power based in Angola, Da Costa was the point person for securing amendments to the on-sale contracts in order to increase the number of turbines that the Republic of Angola would buy from AE.  (Tr. 62, 196.)  Specifically, Da Costa was tasked with increasing the number of turbines purchased by the Republic of Angola from eight to twelve.  (See, e.g., Tr. 62, 196; GX 1419, 1428.)

B.  Evidence of Da Costa's Forgeries.

The government presented evidence that on or about October 12, 2017, Da Costa forged three letter agreements between AE and the Republic of Angola to increase the number of turbines purchased from eight to twelve, and, in the years that followed, falsely maintained that the Angolan government agreed to purchase twelve turbines.

On the morning of October 12, 2017, Francisco Talino and Jose Neto, who were officials within units of MINEA, emailed three draft letters of intent to Ivo Pizarro, the Chief Operating Officer of AE.  (GX 1601T, 1602T.)  The letters of intent related to three of the on-sale contracts between AE and the Republic of Angola.  (See id.)  In qualified language, those

letters stated that MINEA was "interested, should it be recommended so, to proceed with the negotiations for the purpose of acquiring" additional turbines manufactured by GE.  (See id.)  They also stated: "In any case, a decision shall only be taken after approval under the prescribed terms of the applicable law."  (Id.)  Pizarro testified that this language was widely understood to refer to presidential authorization.  (Tr. 503.)  In a reply to a Talino, Pizarro indicated that the draft letters of intent would likely not satisfy the concerns of GE and AE.  (Tr. 525; GX 1600T ("As it is, I believe that it does not serve the purpose . . . .").)

That same day, AE also obtained hard copies of the letters of intent.  (GX 1600T; Tr. 527-28.)  Pizarro testified that later that day, scans or photocopies of those letters of intent were given to Da Costa.  (Tr. 589-90.)  In 2019, Da Costa sent text messages to a GE Power employee, stating that he had picked up hard copies of the signed letters.  (GX 307-3.)

Between 5:52 and 5:56 p.m. on October 12, 2017, Da Costa, through his GE email address, sent three forged PDF letters to AE Chief Development Officer Pedro Bento. (GX 1425N, 1426N, 1427N.)  The original letters of intent included qualified language about the purchase of additional turbines, but the forged letters stated an express agreement on the part of the Angolan government, through MINEA, to purchase four additional turbines.  (See, e.g., GX 1489AT ("I hereby authorise, within the framework of the objectives originally provided for within the scope of the agreement, the supply of four (4) GM 2500+ GEN8 Mobile Turbines . . . .").)  The language in these letters sent by Da Costa mirrored the language contained in letters that he had circulated to GE decisionmakers just six days earlier.  (GX 1498, 1498A, -B, C; Tr. 877.)  Pizarro testified that Bento, the recipient of Da Costa's email, was "not at all" involved in negotiations over the purchase of additional turbines.  (Tr. 481.)

Andrew Crain, the government's expert witness in computer forensics, testified that the forged letters were created in Adobe Photoshop and a website called ilovepdf.com to hide the text of the original documents while preserving their signatures and adding new text. (Tr. 629-43.) Crain also testified that the "base layers" of the forged documents were identical to the original letters of intent signed by MINEA officials Talino and Neto and obtained by Da Costa. (Tr. 669-71.)

At approximately 8:13 p.m. on October 12, 2017, Da Costa emailed colleagues at GE Power and GE Capital, stating in essence that he had successfully obtained the agreed-upon language for the purchase of additional turbines by the Angolan government. (GX 1424.) Da Costa's email stated in part:

> We spent time at PRODEL [a MINEA entity] to go over all the details on the amendments and made sure we got some of the intended letters. We got the contract number 7 signed with the languages that we agreed on and counter signed by AE.

> We then went to ENDE [another MINEA entity] where we got contract number 11 amendment signed with the language approved by Brad and then counter signed by AE.

(GX 1424.) Da Costa's email to GE colleagues annexed photographs of printed versions of the forged letters but not PDF copies of the letters. (GX 1424B, -C, -D.) Metadata for the photos reflected that those photos were taken in the vicinity of Da Costa's residence, approximately fourteen minutes before he sent the email. (Tr. 645-46.)

Kurada testified that based on Da Costa's email and the attached photographs, he believed that the on-sale contracts between AE and Angola had been amended to include a binding commitment from the Angolan government to purchase a total of twelve turbines instead of eight. (Tr. 211.) Marone also testified that he believed that the on-sale contracts had been

amended to provide for the purchase of twelve turbines, thus meeting the condition-precedent for full funding by GE Capital.  (Tr. 69.)

However, employees and officials from the Angolan government and AE maintained that they never agreed to the sale of twelve turbines, and instead had only agreed to the sale of eight.  (GX 127T, 1601T, 1602T.)  AE maintained hard copies of the unaltered letters of intent, and Da Costa's phone had photos of those letters.  (Tr. 548, GX 130P, 131P, 132P, 330-06, 330-07.)  At trial, two AE executives, Pizarro and Chief Financial Officer and Co-CEO Jorge Morgado, testified that AE had sold only eight turbines to the Angolan government.  (Tr. 544, 808.)  In December 2018, more than a year after forged agreements were circulated within GE by Da Costa, MINEA representatives issued a letter stating that they "agreed to acquire a total of 8 [turbines]" and that "no addendum or valid document has been issued which would justify changing the scope of the contracts and the prices."  (GX 1467.)

C.  GE Capital's Disbursement to AE.

Based on the false understanding that the Republic of Angola had agreed to purchase twelve turbines, Kurada sent an email in December 2017 to "key stakeholders" within GE requesting approval to disburse funds from the credit facility formed to fund the Angola Fast Power Deal.  (GX 1441; Tr. 219-20.)  Kurada's email stated that "the funded GE scope will now be 12 [turbines] . . . ."  (GX 1411.)

On December 28, 2017, GE Capital disbursed approximately $267 million to AE, of which AE retained $236 million with the remaining $31 million placed into an escrow account.  (GX 1443; Tr. 248.)

D.  Evidence of Side Payments to Da Costa from AE's Founder.

The government presented evidence that after AE received its disbursement from the GE Capital credit facility, Da Costa and a second GE Power employee, Leslie Nelson, were each paid approximately $5 million by Ricardo Machado, the founder of AE.  Nelson was Da Costa's manager at GE Power.  A series of text messages reflected that Da Costa and Nelson were frustrated that they did not receive a higher payment from Machado.

An email from Da Costa's personal account to Machado's work account, dated January 2, 2018, stated, "Please find attached invoice," to which Machado replied, "Wrong adress [sic] I don't now [sic] what is this."  (GX 1115.)  Within in an hour, Da Costa emailed Machado's personal account and attached an invoice dated December 29, 2017, which identified a "Seller" that was a Da Costa-owned company and a "Buyer" that was a Machado-owned company, with a "Total gross price" of $5,040,000 for work on "Consultant services" for power generation projects in Angola, Cameroon and Ghana and "Supply of Manpower to perform services for Power Generation and services over 2 years."  (GX 1118, 1118A.)

In an interview with law enforcement, Da Costa stated that Machado transferred money to a Dubai-based bank account owned by Da Costa in order "[t]o take care of us," that "it was after the deal went through" and that "I was given like five something million."  (GX 800F, 800F-1TR.)  Da Costa stated that the payment was for "consulting services."  (Id.)

The government presented evidence that Da Costa and Nelson were frustrated that Machado paid each of them $5 million instead of the expected payout of $10 million for each. Da Costa, Nelson and Machado exchanged messages in a group chat that they labeled "Friends." In a series of messages dated April 24, 2018, Nelson wrote to Da Costa and Machado, "This Friends thing is only working for one of us and two of us are getting f***ed / First of all the

amount is lower than we agreed / Second, It comes in small bull**** amounts / Thirdly, this is Supposed to be friends where we grow together / Only one of the friends is growing by himself / Wilson, if I am wrong let me know but this s*** is not working / Two friends worked all of 2017 for this and the bull**** continues."  (GX 303-23.)  Da Costa replied, "Les we really need to meet as this is not the way forward," to which Nelson responded, "But this is a one man show." (GX 303-23.)  Nelson later wrote, "We are doing great Business together / And it should be working for everyone / But it is only working for one Friend / Always Excuses Excuses Excuses."  (GX 303-23.)  Da Costa later replied, "We have to meet and get better alignment as this will bring all of us down / We have to meet quick / Greed is never good amongst friends." (GX 303-23.)

On that same date, Da Costa and Nelson had a separate text exchange that did not include Machado.  (GX 305-07.)  Da Costa wrote: "Please send a message to friends and let Ric know that as friends we got f***ed / We were expecting 10M each / Not this BS / I already told him but better if we are coordinated / And that we are the engine of f [sic] this and we can easily look for someone else to replace Ric in Ghana, Cameroon and Angola today."  (GX 305-07.)

E.  Evidence of Da Costa's False Statements in Furtherance of the Scheme.

The government presented evidence that in 2018 and 2019, Da Costa repeatedly maintained to officials at GE, AE and the Angolan government that Angola had agreed to purchase twelve turbines from AE, and invoked the existence of written agreements without making them available for inspection.

Over the course of 2018, considerable confusion and conflict developed between GE, AE and Angolan officials about the number of turbines purchased by the Angolan government.  (See, e.g., GX 204-01 (December 2018 text messages between Kurada and Da

Costa referencing disputes).)  Pizarro and Morgado testified that in a December 5, 2018 meeting between AE, GE and Angolan government officials, a disagreement arose after Da Costa claimed to have proof that Angola had agreed to the purchase of twelve turbines.  (Tr. 546-47, 784.)  Approximately an hour after the meeting, Da Costa sent himself an email that attached one of the forged letters.  (GX 1464.)  On December 19, 2018, Da Costa texted Kurada of GE Capital that twelve turbines had been financed for purchase by Angola.  (GX 204-01.)

Morgado of AE testified that in a January 2019 meeting with GE, Da Costa stated that the government of Angola had acquired twelve turbines, even though it was Morgado's understanding that Angola had agreed to purchase only eight.  (Tr. 770.)  At that meeting, Da Costa claimed to have letters reflecting the purchase of twelve turbines but did not present them when asked to do so.  (Tr. 770, 840-42.)

Pizarro testified that that in a February 2019 meeting with AE, GE and representatives of Angola, Da Costa claimed that a folded piece of paper he removed from his pocket was proof of amendments for the purchase of twelve turbines.  (Tr. 553.)  When Pizarro asked to see the documents, Da Costa refused, and stated that he would not provide the documents "to anyone from AE."  (Tr. 554.)

Frederic Ribieras, a GE employee, traveled to Angola in October 2019 and met with Angolan officials to discuss issues related to the purchase of the four additional turbines.  (Tr. 854.)  On October 28, 2019, Ribieras met alone with Da Costa in an attempt to learn whether "he had any documents, e-mails, texts" that would explain the discrepancies in the number of turbines purchased by the Angolan government.  (Tr. 855-56.)  Da Costa told Ribieras that he had "real letters" and "documents" memorializing the agreement.  (Tr. 856.)

F.  <u>Procedural History.</u>

Count One of the S1 Superseding Indictment charged Da Costa with wire fraud, asserting that while employed by GE subdivision, he "engaged in a scheme to defraud the Republic of Angola and a second subdivision ('Subidivision-2') of Company-1 [<u>i.e.</u>, GE] in order to fraudulently obtain money and property from the Republic of Angola and Subdivision-2, including by using forged documentation purportedly signed by officials of the Republic of Angola in furtherance of the scheme to defraud . . . ." (ECF 46.)  Count Two charged Da Costa with aggravated identity theft by unlawfully transferring the name and title of an official of the Republic of Angola in relation to the wire fraud charged in Count One.  (<u>Id.</u>)  Count Three also charged aggravated identity theft in connection with the name and title of a second Angolan government official.  (<u>Id.</u>)

Da Costa had moved to dismiss the initial indictment, urging in part that the wire fraud charge was not timely brought under the five-year limitations period.  (ECF 18.)  In an Opinion and Order, the Court denied the motion as premature, explaining that the motion raised merits issues properly determined at trial.  (ECF 29.)

The eight-day trial commenced on November 4, 2024.  The defense made an oral motion for a judgment of acquittal under Rule 29 at the close of the government's evidence, urging insufficiency of the evidence and that the S1 Superseding Indictment was untimely because it did not relate back to the original indictment.  (Tr. 918-23.)  The Court denied the motion from the bench.  (Tr. 923-25.)  On November 18, 2024, a unanimous jury found Da Costa guilty of all three counts.  (ECF 73.)

DISCUSSION.

I.     The Motion for a Judgment of Acquittal Will Be Denied.

        A.  Rule 29 Standard.

        Rule 29(c)(2) provides that "[i]f the jury has returned a guilty verdict, the court

may set aside the verdict and enter an acquittal."  In reviewing a Rule 29(c) motion, the court

"must view the evidence 'in a light that is most favorable to the government, and with all

reasonable inferences resolved in favor of the government.'"  United States v. Anderson, 747

F.3d 51, 60 (2d Cir. 2014) (quoting United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011)).  A

court must also "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices

between permissible inferences, and its assessment of the weight of the evidence."  United States

v. Jones, 482 F.3d 60, 68 (2d Cir. 2006) (citations omitted); see also United States v. Florez, 447

F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility

determination on a sufficiency challenge.").

        "[T]he court may enter a judgment of acquittal only if the evidence that the

defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could

find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir.

1999) (internal quotation marks and citations omitted).  The court must deny the motion "'if any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'"  Anderson, 747 F.3d at 59 (quoting United States v. Aguilar, 585 F.3d 652, 656 (2d Cir.

2009)).

        B.  The Government Presented Evidence Sufficient
             to Prove Da Costa's Intent to Defraud.

        Da Costa urges that the Court should enter a judgment of acquittal because the

government did not present evidence sufficient to prove that he acted with an intent to harm GE

Capital and the Republic of Angola.  (ECF 74 at 1-2.)  He asserts that the evidence instead demonstrated that he "wanted to see the financing occur, so that AEnergia and Ricardo Machado would have sufficient funds to pay the Defendant what they owed him, while Angola received the turbines it needed and GE advanced the financing it wished to advance."  (Id.)

"To convict a defendant of wire fraud, the government must prove beyond a reasonable doubt: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme."  United States v. Gatto, 986 F.3d 104, 113 (2d Cir. 2021) (quotation marks and ellipsis omitted).  "As to the 'scheme to defraud' element, there must be proof that defendants possessed a fraudulent intent.  Accordingly, defendants must either intend to harm their victim or contemplate that their victim may be harmed."  Id. (internal citation and quotation marks omitted).  "'[F]raudulent intent may be inferred from the scheme itself' if 'the necessary result of the actor's scheme is to injure others.'"  Id. (quoting United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994)); see also United States v. Johnson, 945 F.3d 606, 613 (2d Cir. 2019) ("fraudulent intent may be apparent where the false representations are directed to the quality, adequacy or price of the goods themselves because the victim is made to bargain without facts obviously essential in deciding whether to enter the bargain.") (quotation marks and ellipsis omitted).

The trial evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Da Costa intended to harm GE Capital and the Republic of Angola.  This evidence reflected that Da Costa intentionally and knowingly misled decisionmakers at GE Capital, GE Power, AE and the Republic of Angola about the contents of the letter agreements that he had forged and doctored, causing GE Capital to make disbursements from the credit facility under

false pretenses and leaving the Republic of Angola with an apparent obligation to purchase four turbines that they never bargained for.

As to the Republic of Angola, the draft letters of intent executed and circulated by government officials on October 12, 2017 did not agree to the purchase of additional turbines and expressly qualified that further steps were required in order to facilitate any additional purchases. (GX 1601T ("In any case, a decision shall only be taken after approval under the prescribed terms of the applicable law."); 1602T (same).) On December 11, 2018, a letter issued by Angola's Minister of Energy and Water was forwarded to Da Costa, Kurada and others. (GX 1467, 1467T.) The letter stated that Angola's government had "agreed to acquire a total of 8 (eight) units TM 2500 . . . . However, we checked the entry into our territory of 4 (four) units TM 2500 more, making 12 (twelve), without having been given us, by the company AENERGIA our contracted, a plausible explanation about ownership of the 4 (four) units TM 2500. After verifying and confirming the CEO of GE Angola, Mr. Wilson da Costa, we conclude that the four (4) units TM 2500 more were acquired with recourse to the credit granted by GE Capital to the Republic of Angola, which constitutes a serious irregularity, to the extent, Which have not been requested, and no addendum or valid document has been issued which would justify changing the scope of the contracts and the prices." (GX 1467.)

This evidence showed that Da Costa acted with the fraudulent intent to harm the Republic of Angola by fabricating agreements in order to bind them to purchase more turbines than the agreed-upon amount. The evidence showed that Da Costa knew that the Republic of Angola wished to acquire eight turbines and not twelve. As previously summarized, the evidence showed that Da Costa acted with the purpose of facilitating disbursements to AE in order and obtain an undisclosed payment from AE's Machado. The evidence was sufficient for a

reasonable jury to find beyond a reasonable doubt that Da Costa acted with the intent to harm the Republic of Angola.

The evidence also supported the jury's conclusion that Da Costa intended to harm GE Capital. GE Power executive Marone testified that disbursement from the credit facility was contingent upon the Angolan government's purchase of at least twelve turbines. (Tr. 62 ("the idea of lending to Angola was predicated on selling a certain amount of equipment.").) GE Capital executive Kurada testified that the transaction became riskier to GE Capital if the Angolan government bought fewer turbines, stating: "The transaction is underwritten for 12 TMs. So it is critical for us to finance 12 TMs. That's the basis of underwriting. . . . It is more risky if there are lesser TMs." (Tr. 182.) He also explained that Angola was a low-credit, high-risk borrower, and that the number of turbines bought would also affect the deal's financial support from certain countries' export credit agencies. (Tr. 182, 178-79.)

The evidence showed Da Costa's awareness that GE Capital would not make disbursement from the credit facility unless Angola agreed to purchase twelve turbines. The evidence demonstrated Da Costa's false statements about the agreements and his circulation of the forged agreements, including photo images of the documents sent to GE Capital decisionmakers, were intended to cause the disbursement of funds to AE. Da Costa had the intent to harm GE Capital by causing it to disburse funds premised on his falsehoods, with the ultimate goal of personal self-enrichment based on his expected payments from Machado.

Da Costa's Rule 29 motion directed to evidence of fraudulent intent will be denied.

C.  The Government Presented Evidence Sufficient to Prove
that Da Costa's False Representations Were Material.

Da Costa urges that there was insufficient evidence for the jury to find that his

misrepresentations were material to GE Capital's decision to make disbursements from the credit

facility.  (ECF 74 at 3-5.)  He asserts that the government did not elicit testimony from GE

Capital decisionmakers stating that he or she made disbursements based on "his/her receipt of the

letters . . . ."  (Id. at 4.)  He asserts that, if the letters were forged, they "were useful only in

'buying time' for the so-called 'Turbine gap' to be remedied."  (Id.)  He also urges that the

forged letters merely provided for authorization of additional turbine purchases but did not

expressly provide for their acquisition.  (Id.)

To convict a defendant of wire fraud, "the Government must prove that the

defendant in question engaged in a deceptive course of conduct by making material

misrepresentations."  United States v. Calderon, 944 F.3d 72, 85 (2d Cir. 2019) (emphasis in

original).  "As the Supreme Court has put it, a material misrepresentation has 'a natural tendency

to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it

[is] addressed.'"  Id. (quoting Neder v. United States, 527 U.S. 1, 16 (1999)) (brackets in

original).  To be "material," the misrepresentation must "have probative weight" and be

"reasonably likely to influence" the decisionmaker.  Id.  "All of these specifications of the

materiality inquiry target the same question: would the misrepresentation actually matter in a

meaningful way to a rational decisionmaker?"  Id. at 86.  Evidence that decisionmakers relied on

defendant's false statements is sufficient to prove materiality.  See id. at 87-88.

Marone and Kurada both testified that the purchase of twelve turbines, as opposed

to eight, was material to proceeding with the Angola Fast Power Deal and making disbursements

from the GE Capital credit facility.  Marone testified that in 2017, he "was the commercial

finance leader" of GE Power, and his duties included "[e]nsuring that the orders for the business were correctly reported."  (Tr. 48.)  Marone testified that in August 2017, the Angolan government had agreed to buy "only eight" turbines "while we needed them to be 12 and 14 according to the way the deal was put together."  (Tr. 61.)  He testified that the total number of turbines sold "was very important" "[b]ecause the idea of lending to Angola was predicated on selling a certain amount of equipment."  (Tr. 62.)

Marone testified that on October 12, 2017, he and others were forwarded an email from Da Costa containing photos of the forged letter agreements stating that "[w]e spend time at PRODEL to go over all the details on the amendments and made sure we got some the intended letters.  We got the contract number 7 signed with the languages that we agreed on and counter signed by AE. . . .  Please find attached the signed letters."  (Tr. 63-69; GX 1423.)  Marone testified that he understood Da Costa's email and the attached photos of the letter agreements to mean "that we had amended the on-sale contract, and, therefore, we had met the condition precedent for the loan. . . .  It increased the number of TMs that the Angolan government was purchasing from AE up to 12."  (Tr. 69.)

Kurada testified that GE Capital would assume more risk as lender if the number of turbines bought by the Angolan government was smaller than the number purchased by AE. (Tr. 182 ("The – if the number of TMs goes down, if the services amount goes down, but if AE portion remained same, the transaction risk nature will be – it is more riskier to GE [Capital]."").)  Kurada testified that GE Capital underwrote the transaction with the premise that the Republic of Angola would purchase twelve turbines.  (Tr. 182; 201.)  Kurada explained that the Angolan government was one of the biggest credit risks of any sovereign nation, and that GE Capital was "taking significant risk" and needed "GE Company to provide a guarantee or a backstop in the

event if Angola fails to perform their serving the debt obligation . . . ."  (Tr. 182.)  Kurada also

testified that export credit agencies funded by the governments of Canada, Hungary and

Switzerland also were providing roughly $330 million of funding to the GE Power credit facility

based on the expectation that the transaction was for twelve turbines, meaning that each turbine

purchased by Angola increased the financing from export credit agencies and reduced GE

Capital's risks.  (Tr. 176-79.)

Kurada testified that he received Da Costa's email of October 12, 2017 that

attached photos of the three forged agreements.  (Tr. 206-10; GX 1424-N.)  He testified as

follows:

> Q. After receiving these photos, how many TMs did [GE Capital]
>    belief AE sold to MINEA?
> A. 12.
> Q. Were these photos important to [GE Capital's] decision to fully
>    fund the credit facility?
> A. Yes.
> Q. Did [GE Capital] need there to be 12 TMs in order to fully fund
>    the credit facility?
> A. Yes.

(Tr. 211.)  In a later email sent to numerous GE Capital and GE Power employees identified as a

"list of approvers," Kurada included a "final approval summary" stating that "the funded GE

scope will now be 12 TMs . . . ."  (GX 1441.)

Based on this evidence, a reasonable jury could find beyond a reasonable doubt

that Da Costa's false statements were material to GE Capital's decision to make disbursements

from the credit facility in order to fund the Fast Power Deal.  Both Marone and Kurada testified

that, based on Da Costa's email of October 12, 2017 and the annexed photos of the forged letter

agreements, they understood that the Angolan government had agreed to purchase twelve

turbines.  Kurada expressly testified that GE Capital required the purchase of twelve turbines in

order to fully fund the credit facility, and his email to GE's "list of approvers" referenced "the funded GE scope" of twelve turbines.

Da Costa's Rule 29 motion directed to evidence of motive will be denied.

D.   The Government Presented Evidence Sufficient to Prove Venue.

Da Costa separately urges that there was insufficient evidence to prove venue in this District, asserting that the government presented evidence of insignificant, "isolated events" that occurred in this District in connection with the Fast Power Deal scheme  (ECF 74 at 2.)

 "The Government bears the burden of proving venue by a preponderance of the evidence.  Where the Government has prevailed at trial, we review the sufficiency of the evidence as to venue in the light most favorable to the Government, crediting every inference that could have been drawn in its favor." United States v. Lange, 834 F.3d 58, 69 (2d Cir. 2016) (quotation marks and internal citation omitted).  "In fraud cases, venue is proper 'in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue.'" United States v. Teman, 2023 WL 3882974, at *1 (2d Cir. June 8, 2023) (summary order) (quoting United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003)).  "[E]ven acts of third parties unaware of the attempted fraud can be made part of the fraudulent scheme by the defendant." Id. (citing United States v. Kim, 246 F.3d 186, 192-93 (2d Cir. 2001)).

The government presented evidence reflecting that disbursements from the GE Capital credit facility to fund the Angola Fast Power Deal included bank transfers initiated from this District.  The parties stipulated that, if called as a witness, William Jordan of Mashreq Bank New York would have testified that in December 2017, Mashreq Bank servers located in Manhattan transmitted messages to Dubai that effectuated U.S. dollar transactions, including a

- 18 -

transmission of $110,705,400 on December 28, 2017 from a GE Capital account in Manhattan to an AE account in Dubai.  (Tr. 617.)  On December 29, 2017, Mashreq Bank, using servers based in Manhattan, transmitted another $90 million from GE Capital to an AE account in Dubai.  (Tr. 618.)  Separately, the parties stipulated that, if called as a witness, Edward McMahon, a Deutsche Bank employee, would have testified that an audit revealed that on December 28, 2017, two Deutsche Bank employees located in Manhattan used computers located in their Manhattan office to facilitate the payment of $45 million from a GE Capital account to a bank account owned by GE Power.  (Tr. 848-50 & GX 616.)

Based on these testimonial stipulations, a reasonable jury could have found by a preponderance of the evidence that acts in furtherance of the wire fraud scheme charged in Count One occurred in this District when fund transfers were initiated in this District as a consequence of the forged letter agreements that purported to agree to the purchase of eight turbines.

### E.  Da Costa's Motion to Dismiss the Charges as Time-Barred Will Be Denied.

Da Costa urges that the charges against him should be dismissed as untimely.  (ECF 74 2-3.)  The S1 Superseding Indictment was filed on September 19, 2024.  (ECF 46.)  Da Costa states that trial evidence showed that acts in furtherance of the Angola Fast Power Deal scheme occurred at the latest in December 2018 and January 2019.  (ECF 74 at 2.)  He argues that the S1 Superseding Indictment does not relate back to the initial Indictment dated November 17, 2023 because it substantially broadens and amends the original charges, and that the charges against him should therefore be dismissed as untimely.

The federal wire fraud statute has a five-year limitations period.  18 U.S.C. § 3282; United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998).  "[A] superseding indictment that supplants a pending timely indictment relates back to the original pleading and inherits its

timeliness as long as the later indictment does not materially broaden or substantially amend the original charges." United States v. Salmonese, 352 F.3d 608, 622 (2d Cir. 2003). "In determining whether a superseding indictment materially broadens or amends the original charges, [courts] will consider whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." Id. "No single factor is determinative; rather, the 'touchstone' of our analysis is notice, i.e., whether the original indictment fairly alerted the defendant to the subsequent charges against him and the time period at issue." Id. "Superseding indictments have been deemed timely when they simply added detail to the original charges, narrowed rather than broadened the charges, contained amendments as to form but not substance, or were otherwise trivial or innocuous." United States v. Zvi, 168 F.3d 49, 54 (2d Cir. 1999).

Da Costa urges that the S1 Superseding Indictment broadened and substantially amended the wire fraud charged in Count One because it charged him with "using" forged documents whereas the original Indictment stated that he "forged documentation" purportedly from Angolan officials. (ECF 74 at 2-3.) He also notes that the S1 Superseding Indictment charged that the scheme defrauded the Republic of Angola and GE Capital, whereas the initial Indictment described fraud upon the Republic of Angola for the partial benefit of GE. (Id.)

The S1 Superseding Indictment relates back to the original Indictment because it merely clarified details as to the victims and the nature of the scheme charged in Count One. Count One of both the original Indictment and the S1 Superseding Indictment charged Da Costa with wire fraud, asserting that he devised a scheme and artifice to defraud from at least in or about August 2017 through at least in or about 2019, and caused wires to be sent to and from the Southern District of New York and elsewhere in furtherance of that scheme. The Superseding

Indictment supplemented Count One with additional detail as to which entities were victims of the alleged fraud.

Count One of the original Indictment charged Da Costa with the use of forged documentation purportedly from officials of "Country-1" (i.e., Angola) and purportedly signed by an officer of "Company-2" (i.e., AE) in order to fraudulently obtain money and property from Country-1.  It asserts that Da Costa was a senior executive of "Company-1"  (i.e., GE) and that the scheme was undertaken "in part to benefit Company-1 . . . ."  (ECF 3.)

Count One of the S1 Superseding Indictment identifies Da Costa as an employee of "Subdivision-1" (i.e., GE Power) of "Company-1" (i.e., GE).  It asserts that he engaged in a scheme to fraudulently obtain money and property from the Republic of Angola and "Subdivision-2" (i.e., GE Capital) of Company-1, including by using forged documentation purportedly signed by officials of the Republic of Angola.

The S1 Superseding Indictment does not materially broaden or substantially amend the original charges brought in Count One.  It identifies the Republic of Angola by name instead of referencing it as "Country-1" and it identifies Subdivision-2 of Company-1 as a victim of the purported scheme.  While the original indictment described Company-1 as a partial beneficiary of the scheme and the S1 Superseding Indictment identifies Subdivision-2 of Company-1 as a victim of the scheme, this amendment does not broaden the charge or substantially amend it.  It is directed to the same conduct in the same time period, involving the same entities.

In addition, even if the S1 Superseding Indictment did not relate back to the original Indictment, the government presented evidence that Da Costa's conduct in furtherance of the scheme continued as late as October 28, 2019, when Da Costa lied to Ribieras by

maintaining the authenticity of the letter agreements for the purchase of additional turbines.  (Tr. 856.)  This "lulling" conduct in furtherance of the scheme occurred within five years of the filing of the superseding indictment.  <u>See</u>, <u>e.g.</u>, <u>United States v. Jergensen</u>, 797 Fed. App'x 4, 6 (2d Cir. 2019) (discussing lulling conduct in furtherance of wire fraud).

Accordingly, the Court concludes that the S1 Superseding Indictment relates back to the original indictment, and that the limitations period is measured from the date of the filing of the original indictment.  Even if it did not relate back, the government presented evidence of conduct in furtherance of the scheme within five years of the date of the S1 Superseding Indictment.

## II.    The Motion for a New Trial Will Be Denied.

Da Costa moves for a new trial under Rule 33(a), Fed. R. Crim. P., urging that evidence of Da Costa's history of forgeries pursuant to Rule 404(b), Fed. R. Evid., had an "improper effect on the trial."  (ECF 74 at 5-7.)  Da Costa has not made a showing that the Rule 404(b) evidence should not have been received into evidence, and his motion will be denied.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Rule 33(a).  "Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict . . . ."  <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995).  "Rule 33 motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  <u>United States v. McCourty</u>, 562 F.3d 458, 475 (2d Cir. 2009) (quotation marks and brackets omitted).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."  <u>Id.</u>

Da Costa urges that he should receive a new trial because the Court erred in admitting Rule 404(b) evidence.  Evidence of other crimes, wrongs or acts are not admissible to prove a person's character or propensity, but such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Rule 404(b).  The Second Circuit has stated that courts should "take an 'inclusive approach' to 'other acts' evidence: it can be admitted for any purpose except to show criminal propensity, unless the trial judge concludes that its probative value is substantially outweighed by its potential for unfair prejudice."  United States v. Bok, 156 F.3d 157, 165 (2d Cir. 1998).  When a defendant contends that he did not know about or intend to participate in an act of wire fraud, "evidence of his previous participation in a substantially similar scheme [is] highly probative."  United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002); see also United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

At trial, the government presented evidence that on August 10, 2015, Da Costa participated in the forgery of an amendment to a contract between a GE subsidiary and an agency of the Angolan government.  (GX 1482; Tr. 70-72, 701-05.)  The government refers to this document as the "Forged Swap Contract."  Evidence reflected that on August 10, 2015, Da Costa's GE email address received a document sent to him directly by a GE scanner.  (Tr. 70-71.)  That document was the signature page of the Forged Swap Contract, which appeared to have the signature page of an Angolan government employee, Fernando Barros Gonga.  (GX 1482A.)  The government presented evidence that Gonga's actual signature differed from the

signature contained in the scanned document sent to Da Costa.  (GX 142 at 16; GX 1482A; Tr. 702-03; see also ECF 82 at 27 (comparing images of the two signatures).)

Goncalo Torres, a GE project manager based in Angola, testified that in March 2018, he met with officials of the government agency that employed Gonga.  (Tr. 701.)  During that meeting, Angolan officials asked Torres to forward them a copy of the swap contract between GE and the agency, as well as an addendum to the agreement.  (Tr. 702-03; GX 142, 1494.)  An agency official then forwarded the addendum to Gonga, noting that the amendment "contradicts what is reflect in the original barter agreement" and increased the risks of the Angolan government.  (Tr. 706-07; GX 1494, 1494T.)  Gonga then forwarded the email chain to Da Costa, and others, stating in part:

> Dear Mr. Wilson, It is very sad that we just found out in the attached document. We have never negotiated any amendment to the Barter Agreement, which is not presented to us here.  I reaffirm that this signature is not mine and it was falsified, which is really staggering to us that a company of the caliber of GE resorts to these methods of signature falsification to gain advantages. We do not accept these practices and reaffirm that the Guarantees are the ones set forth in the Barter Agreement for the equipment and which was duly signed by the management of GAMEK.

(GX 1494, 1494T; Tr. 707-08.)  Da Costa then forwarded Gonga's email to Torres and two other GE Power employees, stating, "Please don't share these type of documents with customers without keeping me on the loop.  Especially when you where not part of the contract.  Why are we sharing this?"  (GX 1494, 1494T.)  Torres testified that Da Costa's email "[s]urprised" him "[b]ecause it was normal" to send agreements to GE counterparties.  (Tr. 708.)

When this evidence was admitted, the Court gave a limiting instruction under Rule 404(b), stating that Torres's testimony and the exhibits "are not direct evidence of the crime charged.  They are offered by the government in their belief that they relate to the intent of the

defendant and any absence of mistake on the part of defendant.  It may only be considered by you on that issue.  So actions at another time relating to another event, the government says may bear on what happened at that time of the charged events.  That's what they say.  It may not be considered by you on issues of the defendant's character or propensity to do things.  It's just for the purpose that I have said."  (Tr. 725.)

The government also presented evidence about Da Costa's role in a so-called parent company guarantee between AE and GE.  (GX 138, 1400, 1400-T, 1400A to 1400J; Tr. 72-75, 772-777.)  Morgado, then the CFO and co-CEO of AE, testified that in 2018, he and AE founder Machado discussed obtaining a parent company guarantee from GE.  (Tr. 772.)  Morgado testified that he never signed such a guarantee.  (Tr.  772.)  The government then presented evidence of a document dated June 1, 2018, purporting to bear Morgado's signature in three places, under which GE agreed to act as guarantor to AE in its purchase of turbines.  (GX 138; Tr. 772-73.)  Morgado testified that he did not sign the document and that the signatures were not his.  (Tr. 773.)  The government presented evidence that, at Machado's request, Morgado had previously emailed Da Costa documents with "substantially the same text."  (Tr. 776, GX 1400, 1400T, 1400B, 1400C, 138.)  Morgado testified that portions of exhibits 1400B and 1400C, which he had sent to Da Costa as attachments, mirrored the language of the parent company guarantee that contained a forged version of his signature.  (Tr. 776-77; GX 138.)

As it did with the "Forged Swap Contract," the Court gave a limiting instruction to the jury that evidence regarding the parent company guarantee was not admitted as direct evidence of the charged crimes, but as other-act evidence going to intent and the absence of mistake.  (Tr. 789.)  The Court also instructed that the evidence may not be considered as evidence of character or propensity.  (Tr. 789.)

Da Costa has not demonstrated that the evidence related to the Forged Swap Contract and parent company guarantee were improperly admitted under Rule 404(b). These documents and the witnesses' testimony were evidence of other similar acts in which Da Costa received draft documents that were later circulated with the signatures of decisionmakers who disputed that the signatures were their own. The Court gave limiting instructions to the jury at the time the documents were received into evidence. This evidence was properly admitted as evidence of intent, knowledge and absence of mistake.

Even if this evidence were improperly admitted under Rule 404(b), Rule 33 relief would not be warranted. "[A] a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." United States v. Archer, 977 F.3d 181, 189 (2d Cir. 2020). "[A]bsent a situation in which the evidence was patently incredible or defied physical realities, or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must defer to the jury's resolution of conflicting evidence." Id. at 188 (internal citations, quotation marks and brackets omitted). As previously discussed, the government presented evidence that was sufficient to demonstrate Da Costa's guilt. Evidence related to the Forged Swap Contract and the parent company guarantee was no more inflammatory than the charged crimes and was accompanied by limiting instructions. See, e.g., United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999). The government's other-acts evidence was a relatively minor part of its case, and, assuming it was admitted in error, would not have compromised the reliability of the verdict.

Da Costa's motion for a new trial will therefore be denied.

CONCLUSION.

Da Costa's motion for a judgment of acquittal and a new trial is DENIED.  The

Clerk is respectfully directed to terminate the motion.  (ECF 74.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       February 14, 2025